**Kaphy LONG, Lisa Sharring, Barbara Smith, and Velma Metoyer, individually and on behalf of a class of persons similarly situated, Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 86 C 7521.**

United States District Court, N.D. Illinois, E.D.

Jan. 26, 1989.

Samuel Witwer, Jr., Richard F. Sarna,
Witwer, Burlage, Poltrock & Giampietro,
Wayne B. Giampietro, Thomas, R. Meites,
Julia E. Getzels, Meites, Frackman &
Mulder, Chicago, Ill., for plaintiffs.

Gordon B. Nash, Jr., Laurence A. Carton,
Mark E. Furlane, Gardner, Carton & Doug-
las, Chicago, Ill., Michael A. Katz, Trans

World Airlines, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

## I. INTRODUCTION

This action was brought by several flight attendants against their employer, Trans World Airlines, Inc. ("TWA"), challenging TWA's failure to provide them with "designated rights" letters after they went on strike and were replaced as employees. The case was certified as a class action on August 18, 1988. The Court subsequently adopted the following definition of the plaintiff class, pursuant to the parties' agreement:

> All persons who (1) on October 24, 1978, were employed by TWA as cabin attendants, pursers, or service managers and had four years of employment of four years of accrued seniority with TWA and (2) were replaced by permanent employees during the flight attendant strike between March 17, 1986 and May 17, 1986 and thus did not return at the strike's end on the later date.

Class members were then notified of the lawsuit and were afforded until January 17, 1989 to opt out of the class. Presently before the Court are cross motions for summary judgment by the plaintiff class and TWA solely on the issue of liability. For the reasons described below, plaintiffs' motion is granted and TWA's motion is denied.

## II. BACKGROUND

This case concerns the implementation of the Airline Deregulation Act of 1978 ("the Act"), which dramatically altered federal regulation of the airline industry. In order to minimize the effect of this change on airline employees, Congress enacted an "Employee Protection Program" as Section 43 of the Act, 49 U.S.C.App. § 1552. *See generally Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) (*"Alaska Air I"*). Section 43 provides certain benefits to "protected employees," defined as employees who, on October 24, 1978, had been employed by a certified air carrier for at least four years. 49 U.S.C.App. § 1552(h)(1). Section 43 includes two major components: a monthly compensation program, which never became operative, and the imposition on airlines of a first-hire duty for protected employees who are "furloughed or otherwise terminated" by an air carrier.[1]

49 U.S.C.App. § 1552(f)(1) authorizes the Department of Labor ("DOL") to "issue, amend, and repeal such rules and regulations as may be necessary for the administration" of the Employee Protection Program. DOL accordingly promulgated regulations which established a framework for implementing the first-hire rights. The regulations provide that the "Rehire Program" applies only to "designated employees," defined as "protected employee[s] who [are] involuntarily placed on furlough or [are] terminated[2] by a covered air carrier during the eligibility period." 29 C.F.R. § 220.10(a). The regulations then set forth specific exclusions: "A protected employee shall not be deemed to be furloughed or terminated if such employee: ... (4) is on

---

1. 49 U.S.C. App. § 1552(d)(1) provides: "Each person who is a protected employee of an air carrier ... who is furloughed or otherwise terminated by such an air carrier (other than for cause) prior to the last day of the 10-year period beginning on October 24, 1978 shall have first right of hire, regardless of age, in his occupational specialty, by any other [certified] air carrier hiring additional employees.... Each such air carrier hiring additional employees shall have a duty to hire such a person before they hire any other person, except that such air carrier may recall any of its own furloughed employees before hiring such a person. Any

employee who is furloughed or terminated (other than for cause), and who is hired by another air carrier under the provision of this subsection, shall retain his rights of seniority and right of recall with the air carrier that furloughed or terminated him."

2. The regulations' definition of "terminated" is singularly unhelpful: "'Terminated' means, unless expressly provided to the contrary, termination of employment, other than for cause." 29 C.F.R. § 220.10(p).

strike or is withholding services in support of other employees who have struck the covered air-carrier; (5) Is terminated for cause as defined in Section 220.01; [or] (6) Resigned or voluntarily quit for any reason." [3]

The regulations also provide a means for identifying those protected employees who are eligible for first-hire rights. The mechanism created for this purpose is the designated rights letter. 29 C.F.R. § 220.27(a) provides in part: "Not later than the date of separation from employment, a covered air carrier which furloughs or terminates a protected employee during the eligibility period ... shall furnish such protected employee with a notice of rights in the form of a letter or other written documentation that such employee is a designated employee and thereby is entitled to exercise a first-right-of-hire." The regulations also set forth specific information which such a notice must contain.[4]

TWA and other airlines have resorted to a number of means in an effort to prevent the implementation of the Rehire Program. First, they participated in the rulemaking process itself. In January, 1979, the DOL held public meetings with interested parties to obtain opinions regarding the Rehire Program. DOL published proposed regulations in March, 1979, and received public comments. On September 17, 1982, DOL published a revised proposal, followed by a 30-day review and comment period. The final regulations were published November 22, 1983, and they first took effect on May 17, 1984.

The next challenges by the airlines were judicial. On May 17, 1984, the same day that the regulations took effect, the Employee Protection Program was invalidated by the district court in *Alaska Airlines I* because of a legislative veto provision in the Act. *Alaska Airlines, Inc. v. Donovan,* 594 F.Supp. 92, 96 (D.D.C.1984). That decision was reversed by the court of appeals on July 16, 1985. *Alaska Airlines, Inc. v. Donovan,* 766 F.2d 1550 (D.C.Cir. 1985), *aff'd,* 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). In December, 1985, the DOL re-issued the regulations.

On January 22, 1986, a challenge by TWA and fourteen other airlines to the validity of the regulations themselves was rejected in *Alaska Airlines, Inc. v. Brock,* 632 F.Supp. 178 (D.D.C.1986), *modified,* 809 F.2d 930 (D.C.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 145, 98 L.Ed.2d 100 (1987) ("*Alaska Air II*"). The primary argument advanced by the unsuccessful plaintiffs was that only employees who are victims of deregulation should be protected by the duty to hire. The court also commented on the delays which had impeded final implementation of the Rehire Program:

Although this program, § 43 of the Act, has been in effect for over seven years, its turbulent history has prevented airline employees from receiving any substantial benefits from its provisions....

Due to [the] combination of Congressional inaction, administrative delay and litigation, protection for airline employees has remained an unfulfilled promise. Many airlines have resisted recognizing any duty to hire or taken the position that there is no duty until the Department of Labor regulations become effective.

632 F.Supp. at 180. The DOL regulations finally took effect on May 9, 1986.

### III.  FACTS

The parties agree on the essential facts. The history of the plaintiffs' strike against TWA and the resulting legal issues has

---

**3.** The DOL has further explained "that terminations for being on strike are similar to other forms of involuntary termination, and we have deleted that [proposed] exclusion." 50 Fed.Reg. No. 249 at 53097 (Dec. 27, 1985).

**4.** "Such notice of rights shall include, but not be limited to, the following information:
(1) Name;

(2) Social security number (if available);
(3) Occupational specialty;
(4) Date of furlough or termination;
(5) An official of the covered air carrier who can verify the individual's status as a designated employee;  and
(6) Signature, name, and location of the certifying official." 29 C.F.R. § 220.27(a).

been well documented elsewhere,[5] and the Court will set forth only those facts relevant to the issues at hand.

Plaintiffs are former employees of TWA and are members of the Independent Federation of Flight Attendants ("IFFA" or "the union"). They are also protected employees as defined in Section 43 of the Act.

The first collective bargaining agreement between IFFA and TWA was signed in 1978. It was replaced in 1983 by a contract which was subject to amendment beginning July 31, 1984. In the spring of 1984, TWA and IFFA served on each other notices of intended change pursuant to 45 U.S.C. § 156. During 1985 and 1986, they engaged in collective bargaining negotiations and in mediation under the auspices of the National Mediation board. TWA demanded substantial concessions from plaintiffs in the form of lower wages and work rule changes. The union agreed to make some concessions but would not meet TWA's demands. The specific details of the negotiations need not be described here. As the March 6, 1986, strike deadline approached, it was apparent that there was a substantial possibility that no agreement would be reached.

On February 13, 1986, TWA sent a letter to plaintiffs warning that in the event of a strike the airline would continue to operate and would, if necessary, hire permanent replacements. The letter also warned plaintiffs that returning strikers would not necessarily have jobs.

On March 7, 1986, plaintiffs went on strike. TWA intensified replacement efforts which were already underway and instituted the work rule changes. The airline operated by using the services of 1280 TWA flight attendants who crossed picket lines and 2800 new flight attendants.

On May 17, 1986, the union made an unconditional offer to return to work. Because their positions had been filled by replacement workers, however, only a small number of strikers—about 197—were reinstated. Over 5,000 returning strikers who sought reinstatement were refused, approximately 3,000 of whom (the plaintiffs here) had sufficient seniority to qualify as protected employees pursuant to Section 43.

On June 27, 1986, the President of IFFA wrote to TWA's Vice President of Labor Relations inquiring when TWA would send a notice of their status to those employees who were entitled to first hire rights. On August 1, 1986, TWA replied that "the company is in the process of determining which employees are entitled to a first right of hire and all employees will be notified as to their status under the Act by end of the third quarter." In September of 1986, TWA sent a notice to plaintiffs which stated in part:

> The regulations ... provide that protected employees who have been *involuntarily* furloughed or terminated for reasons other than *cause* may be entitled to a first Right–of–Hire with TWA or another pre-deregulation carrier.
>
> Based on a review of our employment records, Trans World Airlines, Inc., has determined that either:
>
> 1. You are a protected employee, however, you are not entitled to a first Right–of–Hire since you either left TWA of your own volition or were terminated for cause.
>
> or
>
> 2. You otherwise did not meet the required criteria for a protected employee.

(Emphasis in original.) The letter was not a "designated rights" letter as defined in

**5.** See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) ("*Alaska Air I*"); Alaska Airlines, Inc. v. Brock, 632 F.Supp. 178 (D.D.C.1986), *modified,* 809 F.2d 930 (D.C.Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 145, 98 L.Ed.2d 100 (1987) ("*Alaska Air II*"); Trans World Airlines, Inc. v. Independent Federation of Flight Attendants, 809 F.2d 483 (8th Cir.1987), *aff'd by an equally divided Court,* — U.S. —, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988) ("*TWA I*"); International Federation of Flight Attendants v. Trans World Airlines, Inc., 819 F.2d 839 (8th Cir.1987), *cert. granted,* — U.S. —, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) ("*TWA II*"); Independent Federation of Flight Attendants v. Trans World Airlines, Inc., 682 F.Supp. 1003 (W.D.Mo.1988) ("*TWA III*"); Independent Federation of Flight Attendants v. Trans World Airlines, Inc., 694 F.Supp. 641 (W.D.Mo. 1988) ("*TWA IV*").

the regulations. Class members who applied for flight attendant positions with other airlines were refused first-hire rights and were told that they would need a designated rights letter which contained the information specified in 29 C.F.R. 220.27(a).[6]

On October 17, 1986, plaintiffs' counsel sent a letter to TWA demanding the issuance of designated rights letters to plaintiffs. In December, 1986, TWA sent another notice to plaintiffs stating that plaintiffs were "protected employees" but taking no position as to whether plaintiffs were "designated employees." The document stated, "[t]his notice is provided in the event you wish to exercise such rights, if any, as you may have under the Act and Regulations." This letter again did not constitute a designated rights letter, and other airlines treated it as insufficient to confer first hire rights.[7]

On December 31, 1986, after receiving comments from TWA and other interested parties, the DOL issued an interpretive ruling regarding the dispute between IFFA and TWA. The ruling stated that "[u]pon careful consideration of all the circumstances, we have concluded that the terminated strikers are entitled to rehire rights." The DOL explained:

> Prior to May 17 it is clear that the flight attendants are excluded from designated status. We believe that their offer to return to work on May 17 changed that status because of the hiring of perma-

nent replacements. While it is difficult to determine whether TWA effectively terminated or furloughed these employees, answering this question is not essential to determining eligibility.[8]

In one sense TWA effectively terminated these employees by virtue of having hired permanent replacements. In the alternative, they effectively placed them on furlough, because they enjoy priority re-employment rights under the Railway Labor Act. In either case Section 220.10(a) provides a first-right-of-hire. They have been involuntarily terminated or furloughed, and thus they are eligible for the first-right-of-hire.

On October 3, 1986, plaintiffs filed this lawsuit for injunctive, declaratory, and pecuniary relief.

In February, 1987, TWA issued the designated rights letter long sought by plaintiffs. In the interim, other airlines had hired non-protected applicants and turned away many plaintiffs.[9]

On May 26, 1987, the court of appeals in *TWA II* held that TWA's new hires were permanent replacements and that the strikers were not entitled to displace them. 819 F.2d at 843. The court did hold that the strikers could displace striking employees who elected to cross the picket lines during the strike and employees who had not finished their training before the end of the strike. *Id.* at 843–47.

---

**6.** *See supra,* n. 4.

**7.** Indeed, a representative of United Airlines found it necessary to send a letter on January 21, 1987 to TWA's Assistant General Counsel requesting clarification:

> We are in receipt of a copy of the Department of Labor's opinion letter, dated December 31, 1986 (see attached), concerning the former striking Flight Attendants from Trans World Airlines (TWA).
> Our past experience with the Labor Protection Program reinforces our belief that we cannot make any assumptions regarding the status of these employees as we cannot ascertain if recall or other circumstances have occurred which would cause any rights under the Act to be relinquished....
> It is our belief that you should determine whether "Notice of Rights" should be issued to these employees to clarify their standing in regards to the Act....

> Until such time as you indicate the designated status of these employees, we will continue to process their applications in a routine manner.

**8.** TWA states that DOL's recognition that this is a difficult question is a "telling admission." However, read in context, the DOL is not saying (as TWA contends) that it is difficult to determine whether replaced strikers are "furloughed or otherwise terminated," but rather that it is only difficult to determine which of the two terms applies.

**9.** TWA now states that plaintiffs are on a preferential reinstatement list and that TWA is obligated to fill any flight attendant vacancies from that list. *See TWA II,* 819 F.2d at 842 (as a matter of labor law, "economic strikers are entitled to reinstatement only as vacancies occur").

On March 9, 1987, the district court in *TWA III* rejected IFFA's claim that TWA had engaged in bad faith bargaining and that the strikers were unfair labor practice strikers who were entitled to return to their jobs after the strike, displacing all replacements and enjoying back pay entitlement. 682 F.Supp. 1003. On May 26, 1988, the same court invalidated TWA's practice of assigning flight attendants to positions as flight service managers (flight attendants who perform additional duties) without offering the positions to full-term strikers. *TWA IV*, 694 F.Supp. at 647.

## IV. PRIVATE CAUSE OF ACTION

■ The parties initially dispute whether the Airline Deregulation Act of 1978 creates a private cause of action to enforce the Regulations' designated rights letter requirement. Because the Act does not explicitly recognize or deny a private cause of action, the existence of such a cause of action must be determined according to the four-part test set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *See also Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512; *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Under this test, the court asks:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). The first three parts, which bear on the issue of legislative intent, are more significant than the fourth part. *Touche Ross*, 442 U.S. at 575–76, 99 S.Ct. at 2489. It is clear that the intent of Congress need

not be explicit, for "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." *Cannon v. University of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). Thus, the requisite intent "may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). *See also Thompson*, 484 U.S. at ——, 108 S.Ct. at 516.

The first question is whether the plaintiffs are members of the class of persons which Congress intended to benefit in passing the statute. Plaintiffs contend that Section 43 of the Act was passed to ensure first hire rights for protected employees such as themselves. Indeed, the section is entitled "Employee Protection Program."

TWA argues that plaintiffs are not among those whom the statute was intended to benefit because they were not "furloughed or otherwise terminated." This position begs the question. Whether plaintiffs were furloughed or terminated goes to the issue of their entitlement to recover relief, not to the issue of whether they have the right to file an action which seeks to prove their entitlement to relief. TWA cites several cases in support of its contention that a private cause of action will not be found where the statute in question was enacted for a class of persons other than the plaintiffs in a given lawsuit. *E.g., Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981); *Universities Research Ass'n, Inc. v. Contu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981). In those cases, however, the Court did not adopt as narrow a view of the benefitted class as TWA urges here. In *Northwest Airlines*, for instance, the Court decided that the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964 were intended to benefit employees rather than employers and thus found that they did not grant employers a cause of action. 451 U.S. at 92, 101 S.Ct. at 1581. The Court

noted that "(t)he ultimate question ... is whether Congress intended to create a private remedy ... that the plaintiff seeks to invoke." 451 U.S. at 91, 101 S.Ct. at 1580. Whether particular plaintiffs actually are entitled to recover is a different question, which may be answered only after it is determined whether there is a private cause of action.

It is clear that the relevant provisions of the Act were passed to provide protection to employees of air carriers. The Court need not delve into differences between those employees who are actually entitled to relief and those who are not in order to find, as it does, that the first portion of the *Cort* test supports a private cause of action in favor of plaintiffs. Whether plaintiffs are entitled to recover in the circumstances of this case is a question concerning the merits, not the existence of a private cause of action.

The second question is whether express indications of legislative intent support or negate a private cause of action. In this case, neither party has been able to locate any legislative history which provides credible support for its position. In light of the first factor's support for a private cause of action, the absence of contrary indications of legislative intent supports the implication of a private cause of action. *See Cort*, 422 U.S. at 82, 95 S.Ct. at 2082.

The third question is whether a private cause of action would be consistent with the purpose of the legislative scheme. Plaintiffs argue that the Act's failure to provide any other enforcement mechanism for the first-hire rights [10] necessitates the implication of a private cause of action. TWA argues that implication of a private cause of action would be inconsistent with the statutory scheme because the Act does not grant first-hire rights to replaced strikers. Again, TWA's position begs the question and relates to the merits rather than the existence of a private cause of action. The Court agrees with plaintiffs that impli-

cation of a private cause of action would complement the statutory scheme by providing the only effective remedy for a right created by the Act. *See McDonald v. Piedmont Aviation, Inc.*, 625 F.Supp. 762, 765 (S.D.N.Y.1986).

TWA further contends that a private right of action would be inconsistent with the legislative scheme because Congress could not have intended to provide strikers with greater protection than they already enjoyed under general labor law. This argument is basically the same argument, rejected in *Alaska Air II*, that the regulations are invalid because they upset the balance of labor relations. TWA's quarrel is with the statute and its implementing regulations; the fact that it views them as unwise is not an adequate ground for finding that Congress could not have intended them to be enforced by a private right of action.

TWA also emphasizes that the Act specifically provides for civil enforcement remedies with respect to certain portions of the Act, not including § 1552. TWA argues that these explicit remedies demonstrate that Congress knew how to specify civil remedies when it chose to do so, and that Congress deliberately omitted a private cause of action for violations of § 1552. However, the civil remedies provided by the Act, 49 U.S.C.App. § 1471–74, concern only civil penalties (primarily fines) imposed by the government. They do not address private causes of action, and their existence cannot be read to imply an intent one way or the other as to the existence of a private cause of action to enforce § 1552.

The fourth question is whether implication of a private cause of action would interfere with the operation of state law. TWA does not argue that such interference would result.

Thus an examination of the *Cort* factors supports a determination that Congress implicitly intended to create a private cause of action to enforce the Employee Protection

---

**10.** As the DOL stated:

> After careful study, the Department has concluded that it is without specific enforcement authority under the Act. However, it appears that a private right of action may be available to a qualified designated employee who actually applied for job vacancies.
>
> 50 Fed.Reg. No. 249 at 53098–99 (Dec. 27, 1985).

Program. Indeed, Congress cannot have intended to forego any remedy for an air carrier's failure to perform actions specifically recognized in the implementing regulations as being necessary in order for the first-hire rights to be realized. The Court concludes that employees have a private cause of action against airlines who injure them by violating the airlines' obligations under the Employee Protection Program.

This result is in accord with *McDonald, supra,* which found that a pilot who qualified as a protected employee and who had been refused first-hire rights enjoyed a private right of action against the airline which refused to hire him. 625 F.Supp. at 764.[11] TWA contends that the instant case is materially different from *McDonald* because it involved an employee who had been terminated rather than a replaced striker, and because the pilot alleged a failure to hire rather than a failure to issue a designated rights letter. Those distinctions, however, are not significant with respect to the initial issue of the existence of a private cause of action in favor of employees.

■ TWA further contends that a private right of action should not be implied because Section 43 concerns only hiring obligations and does not mention designated rights letters. Again, this distinction is immaterial to the implication of a right of action. The designated rights letter is an essential element of the enforcement mechanism created by the DOL under its express authority to implement regulations enforcing the Rehire Program.[12] TWA claims that because Section 43 does not mention designated rights letters, TWA

could not have breached a statutory duty by failing to issue such a letter. It is well settled, however, that "reasonable regulations promulgated pursuant to statutory authority have the force and effect of law." *Pearce v. Director, Office of Workers' Compensation Programs,* 647 F.2d 716, 726 (7th Cir.1981). *See also Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); *John A. v. Gill,* 565 F.Supp. 372, 381 (N.D. Ill.1983). Indeed, valid regulations have the same force and effect as the statute pursuant to which they were promulgated. *Karle v. National Fuel Gas Distribution Corp.,* 448 F.Supp. 753, 767 (W.D. Pa.1978). If the statute itself implicitly creates a private cause of action for violations thereof, and if the regulations necessary to implement the statute are valid and have the same force as the statute, then violations of the regulations must also give rise to liability to a private plaintiff. The fact that the specific obligation violated is set forth in the regulations, rather than in the express terms of the statute, does not eliminate the private cause of action otherwise created by the statute. *Cf. John A.,* 565 F.Supp. at 380 (finding that plaintiff has claim for violation of duty created by regulation).

■ There remains the issue of whether the implied private cause of action allows the recovery of punitive damages. TWA argues that such a remedy should not be implied in the absence of an express indication of intent by Congress. Plaintiffs' complaint seeks punitive damages, but plaintiffs have not responded to TWA's argu-

---

**11.** The *McDonald* decision was cited with apparent approval in *Alaska Air I,* where the Court held that "[t]he language of [the first-hire] provisions is sufficiently unambiguous to notify carriers of their responsibilities and sufficiently detailed to require little further action on the part of the Secretary." 480 U.S. at 687, 107 S.Ct. at 1482. The court then added, "[a] similar conclusion was reached in *McDonald v. Piedmont Aviation, Inc.,* 625 F.Supp. 762, 766 (S.D. N.Y.1986), which sustained a private action brought by an individual pilot claiming the defendant carrier wrongfully denied first right of hire under § 43." *Id.* at n. 9.

**12.** TWA contends that the regulations cannot serve as a source for an implied right of action, citing *Touche Ross,* 442 U.S. at 577 n. 18, 99 S.Ct. at 2489–90 n. 18. In *Touche Ross,* the Court held that the regulations could not provide an implied remedy which was not supported by the statute itself. Here, in contrast, the Act does support such a remedy when viewed under the four-part *Cort* test. That the specific conduct complained of contravenes the requirements of the regulations rather than of the terms of the statute itself does not alter the appropriateness of an implied right of action under the statute to enforce the regulations necessary to implement the statute.

ment. Recovery of punitive damages is an unusual remedy which is not be to be provided without clear intent to create such a remedy. *Cf. Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 627 (7th Cir.1987) (neither statutory language nor legislative history suggested congressional intent to allow recovery of punitive damages under ERISA, 29 U.S.C. § 1132(a)(3)); *Garman v. New York Life Ins. Co.*, 501 F.Supp. 51, 53 (N.D. Ill.1980) (punitive damages are not favored). Because there is no indication in any of the factors examined in connection with the *Cort* test that Congress intended the creation of a remedy for punitive damages, the Court finds that plaintiffs cannot recover punitive damages for TWA's violation of Section 43.

## V. COLLATERAL ESTOPPEL

█ Plaintiffs contend that the Court should not examine whether replaced strikers are "furloughed or otherwise terminated" within the meaning of § 1552(d)(1) because that issue was already decided in *Alaska Air II* and because that decision is binding pursuant to the principle of collateral estoppel.

In *Alaska Air II*, the court rejected a number of challenges to the DOL regulations. Plaintiffs rely on the court's disposition of one of those challenges:

The Airlines' final objection is that the regulations improperly upset the delicate employer-employee 'balance' established by the Railway Labor Act by giving terminated strikers rights under the duty to hire. The contention that this will somehow 'tilt' the balance in a way that is

inconsistent with the statutory scheme for handling labor disputes is based on the most imaginative type of speculation. The Secretary directly and adequately addressed this supposed 'conflict' in fashioning the final rule and his decision was a reasonable accommodation of the policies involved.

632 F.Supp. at 185.

In order for collateral estoppel to apply with respect to issues decided in a previous case, plaintiffs must establish four elements:

(1) that the party against whom the estoppel is asserted was a party to the prior adjudication, (2) the issues which formed the basis of the estoppel were actually litigated and decided on the merits in the prior suit, (3) the resolution of the particular issues was necessary to the court's judgment, and (4) those issues are identical to issues raised in the subsequent suit.

*Garza v. Henderson*, 779 F.2d 390, 393 (7th Cir.1985). *See also County of Cook v. MidCon Corp.*, 773 F.2d 892, 898 (7th Cir. 1985). TWA argues that the decision in *Alaska Air II* does not preclude litigation of the issue of replaced strikers' status under the Act because this issue is not identical to the issue in *Alaska Air II* and because this issue was not actually decided in that case.

The Court finds that the *Alaska Air II* court did not actually determine the status of replaced strikers under the Act. TWA simply argued in *Alaska Air II* that in granting first-hire rights to replaced strikers, the DOL was upsetting the balance created by Congress for labor relations.[13]

---

13. In *Alaska Air II*, the airlines argued: "Contrary to the [Railway Labor Act], the DOL regulations tilt this balance in favor of the striker by assuring him that if he is 'terminated' he will have a right of first hire at a competing airline." Statement of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, filed March 9, 1984, at 39. "[I]t is obvious from the rulemaking background that DOL intends such employees to be eligible for first-hire benefits." *Id.* at 39 n. *. "The regulatory history makes clear that a permanently replaced striker is, if otherwise qualified, eligible for first-hire benefits.... Under those regulations, an employee will have substantially less incentive to

avoid a strike, because even if he or she is replaced by his or her air carrier, he or she has ... an absolute right to be hired by another carrier...." Plaintiff's Opposition to Defendants' Motion to Dismiss or, Alternatively, for an Order Affirming Proposed Regulations and Plaintiffs' Reply Memorandum in Support of their Motion for Summary Judgment, filed April 7, 1984, at 36–37.

The DOL stated: "To ensure that he did not [alter the balance of labor relations], ... the Secretary specifically determined that protected employees who were on strike could not at that time exercise re-hire rights." Defendants' Mo-

The court rejected that argument. The parties and the court thus assumed that replaced strikers were entitled to first-hire rights under the regulations. The parties did not argue about whether the regulations actually applied to replaced strikers. *Cf. United States v. Young,* 804 F.2d 116, 117–18 (8th Cir.1986) (collateral estoppel did not apply where one party had no need to contest the other's version of the facts in the prior proceeding), *cert. denied,* 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987); *De la Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 233–34 (7th Cir.1983) (collateral estoppel did not apply against party which conceded issue on appeal in prior proceeding). More importantly, the court itself did not decide whether replaced strikers were entitled to first-hire rights. It merely assumed that the regulations created such rights for replaced strikers and found that such regulations were within the DOL's authority. The court's assumption that the regulations applied to replaced strikers cannot bind this Court when the *Alaska Air II* court did not need to reach the issue, did not receive arguments on the issue, and did not actually determine the issue. The principle of collateral estoppel does not, therefore, preclude litigation of the issue of replaced strikers' qualifications as designated employees.

## VI. TERMINATION OR FURLOUGH

■ Having found that plaintiffs enjoy a private cause of action and that an examination of the merits is not precluded by the decision in *Alaska Air II,* the Court reaches the question of whether plaintiffs, as replaced strikers, were "furloughed or otherwise terminated" under Section 43 and accordingly were entitled to first-hire rights and designated rights letters.

Both parties focus on the meaning of the words "terminated" and "furloughed" and on each other's apparent subjective view of the circumstances. Plaintiffs argue that the natural meaning of "furlough" is "to subject to an enforced leave of absence," and that the natural meaning of "terminat-

ed" is "coming to an end," citing Webster's Dictionary. Plaintiffs argue that they are out of work because of TWA's actions and that they have therefore been terminated or furloughed. They emphasize that TWA no longer considers them "employees" and that TWA has indicated in other contexts that there is little chance that plaintiffs will be rehired.

TWA emphasizes that plaintiffs chose to strike knowing that doing so could result in their replacement by other workers and thus the loss of their jobs. It argues that plaintiffs cannot have been furloughed because the specific procedures for furloughing employees were not followed, and that even accepting plaintiffs' definition of terminate, any termination was performed by plaintiffs themselves rather than by TWA.

TWA also points out that the Eighth Circuit found plaintiffs to be "employees," *TWA II,* 819 F.2d at 842, so plaintiffs cannot have been terminated. TWA further argues that plaintiffs were still on strike after their offer to return to work, citing *TWA II,* 643 F.Supp. 470, 473 (W.D. Mo. 1986), *aff'd in part, rev'd in part,* 819 F.2d 839 (8th Cir.1987), *cert. granted,* — U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988), and that they therefore fall within 29 C.F. R. § 220.10's exclusion of strikers from the definition of designated employees. That regulation, however, is reasonably read as excluding employees who are *voluntarily* on strike; in *TWA II,* the district court stated that the employees "were in fact 'on strike' involuntarily." *Id.* TWA's attempts to latch onto the language of other courts which used words such as "employees" or "strike" when those courts were not faced with the issue presented here are misplaced.

TWA next argues that Congress could have explicitly extended first hire rights to replaced strikers if it so desired, and that its silence on the issue is evidence of its lack of any such intent. However, Congress did not explicitly exclude replaced strikers from the first hire program, so plaintiffs could just as easily argue that

tion to Dismiss or, in the Alternative, for an Order Affirming the Secretary of Labor's Pro-

posed Regulations, Filed April 12, 1984, at 38–39.

Congress intended replaced strikers to be included. The silence of Congress thus does not provide support to either side.

TWA points out that the regulations provide that the Rehire Program applies only to "employees who are expressly granted a hiring preference under the Act and these regulations." 29 C.F.R. § 220.03. Because the regulations do not expressly grant a hiring preference to "replaced strikers," TWA contends that replaced strikers are not covered by the Rehire Program. Again, TWA's argument begs the question. The regulations do expressly grant a hiring preference to employees who have been terminated, and the question is whether plaintiffs were terminated.

Thus the Court finds TWA's arguments based on technical interpretations of the applicable words unhelpful. Clearly, TWA did not terminate or furlough plaintiffs in the usual sense of a unilateral action by an employer. It is just as clear that TWA's action in hiring permanent replacements for the strikers resulted in the plaintiffs being involuntarily out of work. Arguments over dictionary definitions and usual procedures simply do not apply to this situation, where the actions taken fall in the grey area between the clear extremes of employees who were fired or laid off and employees who quit voluntarily.

What the Court does find helpful is the statutory language and context and the DOL interpretations. In the first place, Congress' use of the language "furloughed or otherwise terminated," 49 U.S.C.App. § 1552(d)(1), indicates that Congress cannot have meant "terminate" in the narrow sense urged by TWA. By its use of the word "otherwise," Congress clearly considered a furlough to be a type of termination; it therefore intended termination to mean something broader than a unilateral action by an employer resulting in the permanent cessation of the employment relationship. It is thus unnecessary to choose between the terms "furloughed" and "terminated," or even to determine whether plaintiffs were "furloughed." It is only necessary to determine whether they were "terminated" in the broad sense used by Congress.

The DOL's interpretation of the word "terminated" as including replaced strikers accords with this broad meaning. TWA argues that the DOL's interpretation is not persuasive and that it is not binding, citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (administrative rulings, interpretations, and opinions may be resorted to for guidance, but their weight depends on the factors which give them persuasive power). In the circumstances of this case, however, the court finds that the DOL's interpretation is entitled to substantial deference. *See Red Lion Broadcasting v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong"). Congress clearly did not undertake to provide a comprehensive definition of "terminate;" that was one of the many details it delegated to the DOL. Congress gave the DOL authority to implement the statute, and the resulting regulations have been upheld against numerous challenges. Furthermore, the interpretation at issue in this case is an interpretation of the DOL's own regulations— regulations which were upheld in *Alaska Air II* even on the assumption that the DOL's interpretation is correct. *See supra* at 856–857.

The DOL's position is most clearly stated in its interpretive ruling issued December 31, 1986, in which it found plaintiffs to have been furloughed or terminated.[14] This position is consistent with earlier statements by DOL concerning the Rehire Program. DOL specifically decided not to exclude "terminations for being on strike" from the definition of a termination:

> Under the proposed § 220.10 the Department set forth criteria to determine whether or not a protected employee has been furloughed or terminated within the meaning of the Act. In addition to retirees and voluntary quits, we stated that

14. *See supra* at 852.

strikers, employees who respect picket lines, or employees who had been terminated for being on strike would not be eligible for the Rehire program. Several unions opposed these positions arguing that our prohibitions would have a chilling effect on the exercise of rights under the Railway Labor Act.

"We think it is evident that strikes and sympathy strikes are neither furloughs nor terminations which the Act requires to initiate a preference in hiring.... On the other hand, we agree that terminations for being on strike are similar to other forms of involuntary termination, and we have deleted that exclusion."

50 Fed.Reg. No. 249 at 53097, Dec. 27, 1985.[15] As TWA has pointed out, it is illegal to terminate an employee for being on strike. *See NLRB v. Browning–Ferris Industries, Chemical Services, Inc.*, 700 F.2d 385, 389 (7th Cir.1983). The DOL, therefore, must have used termination "for being on strike" to mean displacement by permanent replacements as a result of a strike rather than actual discharge of an employee for striking. Its deletion of that exclusion from its definition of termination evinces an intent that replaced strikers be included as designated employees.

On the basis of the statutory language, the language of the regulations implementing the statute, and the DOL interpretation of the statute and regulations, the Court concludes that replaced strikers are entitled to first hire rights under the Employee Protection Program. On May 17, 1986, when plaintiffs unconditionally offered to return to work, they ceased being voluntary strikers and were effectively terminated by TWA. TWA therefore became obligated at that time to deliver designated rights letters to plaintiffs.[16]

---

**15.** *See also supra* at n. 13. This decision was also relied on by the DOL in reaching its December 31, 1986 conclusion that plaintiffs qualify as designated employees: "The notice of proposed rulemaking published September 17, 1982, contained Section 220.10(b)(5), a specific exclusion for employees who were terminated for being on strike. The final regulation, dated December 27, 1985, omitted that provision."

**16.** It may be noted that this conclusion does not result in any unfair surprise to TWA. As is apparent from TWA's position in the *Alaska Air*

## VII. CONCLUSION

The Employee Protection Program embodied in Section 43 of the Airline Deregulation Act and its implementing regulations grants first-hire rights to protected employees who have been furloughed or otherwise terminated. In order to exercise these rights, such employees are entitled to designated rights letters. Striking employees who have been lawfully replaced are included among those employees entitled to designated rights letters, and the Act implicitly provides them with a private right of action to enforce this right. Plaintiffs' motion for summary judgment on the issue of TWA's liability for failure to issue such letters in a timely manner is therefore granted, and TWA's cross-motion for summary judgment is denied.

---

*II* case, *see supra* at n. 13, TWA knew since at least March, 1984, that there was at least a substantial possibility that it was required to deliver designated employee notices to plaintiffs. Furthermore, delivering such notices would not have been burdensome for TWA. The court can only conclude that TWA deliberately chose not to deliver the notices, accepting the risk that they would someday be found liable, in an attempt to punish plaintiffs for exercising their right to strike.